UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
WILLIAM K. DUFFY, KENNETH HUBER,
PHILLIP CAPOBIANCO, JOHN DUFFY,
PAUL O'BRIEN, MARC HERBST, JAMES
HANEY, JR., JAMES PRATT, III, SCOTT
ADRIAN, and ROBERT AHEARN as Trustees
of Local 138, 138A & 138B, International Union
of Operating Engineers Welfare Fund, Legal Fund,
Apprenticeship Training Fund, and Annuity Fund,
and MICHAEL FANNING as CEO of the Central
Pension Fund,

                Plaintiffs,

       - against -

EAST PORT EXCAVATION & UTILITIES
CONTRACTORS, INC., EASTPORT MANOR
CONSTRUCTION, INC., and STEVEN
GOVERNALE,

                Defendants.
--------------------------------------------------------------X

**MEMORANDUM AND ORDER**
07-CV-217 (DRH) (ARL)

A P P E A R A N C E S :

ARCHER, BYINGTON, GLENNON & LEVINE, LLP
Attorneys for Plaintiffs
One Huntington Quadrangle
Suite 4C10
Melville, New York 11747
By:    James W. Versocki, Esq.

MARSHALL M. STERN, P.C.
Attorneys for Defendants
17 Cardiff Court
Huntington, New York 11746
By:    Marshall M. Stern, Esq.

HURLEY, Senior District Judge

      Plaintiffs William Duffy, Kenneth Huber, Phillip Capobianco, John Duffy, Paul O'Brien,

Marc Herbst, James Haney, Jr., James Pratt, III, Scott Adrian, and Robert Ahearn, as Trustees of

Local 138, 138A & 138B, International Union of Operating Engineers Welfare Fund, Legal

Fund, Apprenticeship Training Fund, and Annuity Fund, and Michael Fanning, CEO of the

Central Pension Fund (collectively, the "plaintiffs" or "Funds"), have brought this action pursuant

to Sections 515 and 502(a)(3) of the Employment Retirement Income Security Act of 1974

("ERISA"), alleging that defendants East Port Excavation & Utilities Contractors, Inc. ("East

Port Excavation"), Eastport Manor Construction, Inc. ("Eastport Manor"), and Steven Governale

("Governale") (collectively, "defendants") violated their statutory and contractual obligations to

report and make contributions to the various plaintiff funds for the period between June 1, 2000

and December 31, 2005.

<u>BACKGROUND</u>

A.   <u>Nature of the Dispute</u>

On September 20, 2004, plaintiffs filed a separate action against "East Port Excavating &

Utilities and Steven Governale d/b/a East Port Excavating & Utilities" alleging that these

defendants were delinquent in making their required contributions to the same plaintiff Funds for

the period between June 1, 2000 and May 31, 2004.  (<u>See</u> Case No. 04 CV 4061 (the "Initial

Action").)  The Initial Action was commenced after a payroll audit of East Port Excavation's

books and records, performed by auditors from the firm of Schultheis & Panettieri, LLP in March

2004 (the "First Audit"), allegedly revealed that the named defendants owed delinquent fringe

benefit contributions to the Funds in the amount of $171,735.10.  (Compl. in Initial Action ¶ 17.)

On March 30, 2006, the parties agreed to settle the Initial Action during a conference before

Magistrate Judge Lindsay, and agreed that plaintiff would:

conditionally withdraw [the Initial Action] for a period of ninety days

-2-

> from today, with leave to reopen by written notice to the Court, absent which the action will be deemed dismissed pursuant to Rule 41, on the bases of the defendants' agreement, which has been accepted and affirmed by the defendants here today, that they will permit plaintiffs' auditors to examine the records listed in the funds' February 17, 2004 letter for both East Port Manor Construction, Inc. and East Port Excavating & Utilities for the period June 1, 2000 through December 31, 2005.

(Judge Lindsay's Mar. 5, 2008 Report & Recommendation at 2 (quoting Tr. of Mar. 30, 2006 Conference at 2).)

The present action was commenced solely on the basis of the single and separate audit conducted by Berdon LLP in August 2006 for the period between June 1, 2000 and December 31, 2005, which allegedly revealed that defendants owed delinquent contributions to the Funds in the amount of $179,230.98 (the "Second Audit").  (Compl. ¶ 49.)[1]  During the trial, defendants produced some documentation refuting some of plaintiffs' claims.  As a result, the Fund's demand was reduced by way of stipulation to $156,619.46.  (Tr. 290:15-291:20.)

B.     Relevant Collective Bargaining Provisions

The Collective Bargaining Agreement ("CBA") governs, inter alia, the wages and benefits paid to members of the International Union of Operating Engineers, Local Union 138, 138A & 138 (the "Union" or "Local 138").  Specifically, Article IV, Section 2 of the CBA obligates a signatory employer to make contributions to the Funds in amounts set forth in the Wage and Benefit Schedule appended to the CBA.  (Pls.' Ex. 24, Art. IV, § 2.)  Further, Article IV, Section 2-E provides that "[e]mployers delinquent in the payment of required monies to the Funds shall be liable for immediate payment of all delinquencies" as well as interest and attorneys' fees.

---

[1]  Neither Berdon, (Tr. 36:11-18), nor the Union considered the First Audit, (Tr. 100:2-5), in preparing and sending the Second Audit to Defendants.

(Pls.' Ex. 24, Art. IV, § 2-E.)  Finally, Article IV, Section 2-F of the CBA gives the Union and

the Funds "the right to audit all books and records of the Employer to insure compliance with the

terms of [the CBA]."  (Pls.' Ex. 24, Art. IV, § 2-F.)

     Article IV, Section 6 of the CBA provides:

> The party of the first part agrees to work all his usable equipment before hiring or contracting for outside equipment of the same type and size.  Assignments, number and choice of equipment remain at the discretion of the Employer.
>
> The party of the first part shall be defined to include any employer having common ownership, control of labor relations, etc. with the party of the first part.  Upon request by the Union, the Employer shall provide information regarding the terms of any contract for using any outside equipment and leasing.  Such arrangements shall not be used to deprive employees covered by this Agreement of employment or as a subterfuge to avoid the provisions of this Agreement.

(Pls.' Ex. 24, Art. IV, § 6.)

     Article V, Section 3 of the CBA provides:

> The Employer will not unilaterally subcontract out work or fail and/or refuse to follow the Union's dispatching procedure in order to avoid compliance with this Agreement.

(Pls.' Ex. 24, Art. V, § 3.)

     Finally, Article XI of the CBA provides:

> The terms, covenants and conditions of this Agreement shall be binding upon all Subcontractors at the site to whom the party of the first part may have sublet all or part of any contract entered into by any of the Contractors of the party of the first part:
>
> All construction site work performed by the Contractors or Subcontractors and all services rendered for the Contractors or Subcontractors shall be rendered in accordance with the provisions of this Agreement and by parties to this Agreement.

If a Contractor, Subcontractor, or Employer shall subcontract construction site work covered by this Agreement, provision shall be made in any contract for compliance by such Subcontractors with the full terms of this Agreement.

A Contractor, Employer or Subcontractor shall be financially responsible for all fringe benefit contributions to any Funds provided for by this Agreement which are required to be paid either by it, or by its Subcontractor, or the Subcontractor of its Subcontractor for work performed on the Contractor's job or projects.

(Pls.' Ex. 24, Art. XI.)

C.      The Parties' Positions

Plaintiffs contend that they are entitled to the revised amount of the deficiency, $156,619.48, as well as appropriate interest, liquidated damages, costs, and reasonable attorneys' fees. According to plaintiffs, the Second Audit provides prima facie evidence of the total amount of fringe benefit contributions owed, and shifts the burden to defendants to produce evidence to challenge their calculations. (Pls.' Pre-Trial Mem. at 7.) Plaintiffs assert that defendants have failed to provide sufficient information to refute the findings of the Second Audit. (Id.) Plaintiffs further contend that East Port Excavation and Eastport Manor are jointly and severally liable to the Funds under the single employer doctrine or, in the alternative, because they are alter egos. (Id. at 8-11.) Finally, plaintiffs assert that the corporate veils of East Port Excavation and Eastport Manor should be pierced such that Governale be held individually liable, jointly and severally, with those corporate entities for the damages due. (Pls.' Post-Trial Mem. at 12.)

Defendants assert that the Second Audit was based on several "faulty assumptions," as well as numerous factual, arithmetic, and transcription errors, and "is so flawed that it cannot be given any credibility." (Defs.' Post-Trial Mem. at 3-6.) Defendants further contend that

plaintiffs have not met the standard necessary to pierce the corporate veil because they have failed to "provide any evidence of a double-breasted operation, that a fraud of any type was committed[,] or that Steven Governale personally benefitted from any transaction pertaining to the payment of Local 138 benefits."  (Id. at 6.)

D.    Bench Trial

The case was tried, non-jury, on June 6, 7, and 20, 2011 with proposed findings of fact and conclusions of law, along with post trial memoranda being submitted thereafter.  The purpose of this Memorandum & Order is to furnish my post-trial Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure ("Rule") 52(a)(1).

E.    Burden of Proof

Both parties take the position that a burden-shifting paradigm is appropriate in this case. Plaintiffs assert that the "audit report is based on reasonably objective grounds that establish a prima facie case concerning the amounts determined in the Berdon Audit, which shifts the burden to the employer/Defendants to demonstrate the inaccuracy of the audit results."  (Pls.' Post-Trial Mem. at 9.)  According to plaintiffs, once they "establish[] a prima facie case via the Berdon Audit, the burden shift[s] to Defendants to come forward with evidence of the precise amount of work performed, or evidence that any assumptions underlying the audit are incorrect." (Id.)  Plaintiffs assert that defendants "have failed to overcome their burden to demonstrate, with concrete specifics, any claimed inaccuracies in the Berdon Audit."  (Id. at 10.)

Defendants also assert that a burden-shifting framework is applicable here: "First, the Fund must establish a prima facie case by demonstrating the inaccuracy of the employer's contribution."  (Defs.' Post-Trial Mem. at 2-3.)  "'Once the Funds produce evidence that raises

-6-

genuine questions about the accuracy of the employer's records and the number of hours actually worked, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or evidence that the assumptions underlying the audit are incorrect.'" (Id. (quoting Local 282 Welfare Trust Fund v. A. Morrison Trucking, Inc., 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993)).   However, in defendants' view, plaintiffs have not made out a prima facie case and thus the burden of proof remained with them throughout.

        "'[W]hile the Second Circuit has not specifically addressed the applicable standard where a benefit fund contests the amount of contributions owed by an employer, other circuits to consider the issue have held that where a benefit fund produces evidence 'raising genuine questions concerning an employer's failure to maintain adequate records,' the burden shifts to the employer to come forward with 'evidence either of the precise number of hours worked or to negate the reasonableness of the inferences to be drawn from the plaintiff fund's evidence.'" Gesualdi v. RRZ Trucking Co., LLC, 2011 WL 1988374, *4 (E.D.N.Y. May 20, 2011), quoting Hanley v. Orient Beach Club, Inc., 1998 WL 65990, at *5 (S.D.N.Y. Feb 18, 1998) which, in turn, cited, inter alia, Combs v. King, 764 F.2d 818, 825-26 (11th Cir. 1985).   The burden-shifting rule enunciated in Combs was synopsized by the Second Circuit in Reilly v. Reem Contracting Corp. thusly:

> [A] plaintiff first must show (a) improper record-keeping by the defendants, (b) that employees performed work for which they were improperly compensated, and (c) the amount and extent of that work as a matter of just and reasonable inference, before the burden shifts.  If it sustains that burden, the onus shifts to the employer-defendant to disprove damages.

380 Fed. Appx. 16, 20, 2010 WL 2202947 (2d Cir. 2010)(internal citation and quotation marks

deleted).

Given that the employer is in the best position to reconstruct the number of hours worked by its employees and in what capacities in those instances where its records are incomplete or otherwise unreliable, I will utilize the Combs' analytical approach should the Funds first establish the inadequacy of the records furnished to their auditors, Berdon LLP, in the summer of 2006. See LaBarbera v. A. Morrison Trucking, Inc., 2011 WL 703859, at *6 (E.D.N.Y. Feb. 18, 2011) and Grabois v. Action Acoustics, Inc., 1995 WL 662127, at *3 (S.D.N.Y. Nov. 9, 1995).

FINDINGS OF FACT

A.    The Funds

1.    Local 138 represents operating engineers[2] and covers a territory encompassing Nassau and Suffolk Counties in New York.  (Tr. 17:17-18; 18:4-12.)

2.    "The operating engineers have a reciprocal system in place [with other operating engineer locals in New York State. Therefore] any benefits purchased in another jurisdiction [like New York City, such as] welfare, pension and annuity benefits, are sent to the home Local [here, Local 138]."  (Tr. 39:23-40:1; for further testimony about this reciprocity arrangement, see, e.g., Tr. 49:1-51:5 and Tr. 192:16-193:23.)

3.    The Funds are fringe benefit funds associated with the Union, including the stamp fund, pension fund, annuity fund, apprentice training fund, joint industry advancement fund, and legal fund.  (Tr. 16:20-25; 19:1-17.)

4.    The procedure by which an employer makes contributions to the Funds is set forth in the

---

[2]    Operating engineers "move dirt, [ ] put down road, build bridges and buildings," and operate heavy equipment necessary to complete those tasks.  (Tr. 17:18-22.)  The operation of such heavy equipment requires "skill and training."  (Id.)

CBA.  (Tr. 19:8-10.)

5.      An employer obligates itself to make contributions to the Funds on behalf of Union members by signing the CBA.  (Tr. 18:13-15.)

6.      Between 2000 and June 1, 2005, an employer or contractor who was a signatory to the CBA made contributions to the Funds by purchasing benefit stamps from the stamp fund, and would distribute those benefit stamps to its members along with their paychecks. Members would then have the obligation to redeem those stamps back to the stamp fund in order to get the appropriate benefits.  (Tr. 19:11-20; 20:6-11.)[3]

7.      As of June 1, 2005, the Funds began using a "voucher program" instead of the stamp system.  Under the "voucher program," benefits were allocated to members at the time their employers purchased those benefits.  In other words, there were no more stamps distributed that had to be redeemed.  (Tr. 21:9-22.)

8.      The Funds employ two methods to determine whether contractors who are signatories to the CBAs are making proper contributions to the Funds.  Under the first method, the Funds generate spreadsheets that indicate when a contractor "last purchased benefits," which members worked for that contractor during the relevant time period, and whether those members reported contributions to the Funds.  (Tr. 21:25-23:1.)

9.      The second method is a payroll audit method, pursuant to which an outside accounting or law firm performs a payroll audit on Signature contractors to ensure "that all benefits are

---

[3]      During that time period, in lieu of purchasing benefit stamps to distribute to members, some employers chose to give members two checks each pay period: one check for their wages, and then a second check made out to the stamp fund.  This put "the onus on the member to purchase the stamps himself and then redeem them."  (Tr. 20:12-16.)

made in a timely fashion" and that members are paid all benefits to which they are

entitled.  (Tr. 23:2-16.)

B.  The Defendant Corporate Entities

10.  Eastport Manor was incorporated in 1994 by Governale's father.  Governale served as

vice-president of Eastport Manor, but did not have any ownership interest in the

corporation.  (Tr. 143:17-22; 144:4-6.)

11.  As vice-president of Eastport Manor, Governale signed checks on behalf of the

corporation (Tr. 145:18-21), made decisions to hire and fire employees  (Tr. 145:22-

146:3), and signed contracts – including collective bargaining agreements – on behalf of

the corporation (Tr. 143:23-144:3.)  As of 2001, Governale was also responsible for

generating business for Eastport Manor.  (Tr. 148:12-14.)

12.  East Port Excavation was incorporated on October 22, 2001 by Governale and, at all

relevant times, he has been the sole owner of that corporation.  (Tr. 144:10-16; 147:10-

12; Defs.' Ex. A.)

13.  As of October 22, 2001, East Port Excavation began doing contracting work.  (Tr.

147:10-13.)  Eastport Manor became the payroll company for East Port Excavation.  (Tr.

147:17-148:4.)  East Port Excavation would pay Eastport Manor the money necessary to

make the payroll for East Port Excavation.  (Tr. 148:1-4; Pls.' Ex. 1.)  Eastport Manor

remained as the payroll company for East Port Excavation until 2006.[4]  (Tr. 148:17-21.)

14.  As of October 22, 2001, employees of Eastport Manor became employees of East Port

---

[4]       In 2006 or 2007, East Port Contracting Corporation, which was also incorporated
by Governale, took over as payroll company for East Port Excavation.  (Tr. 152:15-20.)

Excavation.  (Tr. 149:14-17.)

15.    It is undisputed that Governale is, and was during the relevant time period, the functional

head of both corporate defendants.  As such, I find that he managed the daily operations

of those corporations and determined which obligations – including required benefit

contributions to the Funds pursuant to the CBAs – were paid and when.

C.    The Corporate Defendants are Signatories to a CBA

16.    On August 8, 2002, East Port Excavation (through Governale) became a signatory of the

CBA with the Union.  (Pls.' Ex. 24.)  The effective date of that CBA was June 1, 2000

through May 31, 2004.[5]   (*Id.*)

17.    Article V, Section 2 of the CBA entered into by East Port Excavation provides:

> This Agreement shall be in full force and effect from June 1, 2000, to
> and including May 31, 2004 and shall continue from year to year
> thereafter unless written notice of desire to cancel, modify or
> terminate the Agreement is served by either party upon the other at
> least sixty (60) days prior to date of expiration or any annual
> anniversary date thereafter.

(Pls.' Ex. 24, Art. V, § 2.)  This was referred to by William Duffy, Jr., the Funds'

Administrator and President ("Duffy"), as an "evergreen clause." (Tr. 29:13-17.)

18.    The Union never received any written notice from East Port Excavation that it desired to

cancel, modify, or terminate the CBA pursuant to the evergreen clause.  (Tr. 28:24-29:4.)

19.    Clearly, East Port Excavation was a signatory to the CBA; defendants do not claim

otherwise.

---

[5]    For East Port Excavation – which, unlike Eastport Manor, did not become a CBA
signatory until after June 1, 2000 – the audit period began with the twelve month period ending
May 31, 2003.  (See Berdon's Aug. 31, 2006 Letter to Pls.' Board of Trustees, which is part of
Pls.' Ex. 21.)

20.   Whether Eastport Manor was also a signatory, however, is a more complicated question, largely because of reservations harbored by Governale.  When asked to confirm that Eastport Manor was also a signatory as reflected in plaintiffs' exhibit 23, he responded: "I can't say for certain that I know that." (Tr. 176:1.)  He identified the source of his uncertainty as (1) the existence of two page 21s, only one of which bore his signature, (2) the absence of a date on the document, and (3) that, although he was able to find the East Port Excavation CBA after the present dispute arose, he could not "find [the one for] Eastport Manor anywhere."  (Tr. at l76:17.)   However, Governale acknowledged that contributions to the Fund were made by Eastport Manor on behalf of some of its employees.  (Tr. 145:1-4; Tr. 179:16-21.)  That was so, Governale proffered, because even though he believed there was no contract between the contributing entity and Local 138, the Union simply "accept[ed his] checks." (Tr. 179:14-15.)   Why he sent the checks in the first place – given his mindset – remains unexplained.

21.   Some clarification as to the existence or non-existence of a CBA between the Union and Eastport Manor was provided during plaintiff Duffy's testimony.  He explained that the Union files a CBA consistent with the employer's name on the document's cover sheet. Here, the cover sheet of plaintiffs' exhibit 23 reads in relevant part: "Eastport Manor Corporation."  That fact, coupled with the contributions made to the Union by Eastport Manor, Governale's uncertainty as to the matter, and his signature on one of the two page 21s, causes me to conclude that it is more probable than not that Eastport Manor was a signatory to a CBA with the Union.  Accordingly, that is my finding.

D.   The Berdon Audit

-12-

22.     Plaintiffs called Joseph Reinhardt ("Reinhardt") to the stand to explain the audit

procedure.  Reinhardt, a CPA, is a partner with the "accounting and consulting" firm of

Berdon LLP, which has been the auditors for the Fund since 2005.  (Tr. 60:20-61:21.)  In

"early 2006, possibly late 2005," Berdon was "engaged to audit East Port Excavation . .

.,"[6] (Tr. 64:15-19), for the period from June 2000 to December 2005.  Such audits are

permitted under the terms of the CBA.   (Pls.' Ex. 24, Art. IV, § 2-F.)

23.     In keeping with Berdon's standard procedure, it made an appointment to visit the

corporate defendants' workplace to review their tax returns, payroll journals and other

documents bearing on the hours worked and the nature of the tasks performed by the

corporations' employees.  Berdon then compared that information with the Union's

membership list and the corresponding contribution reports, looking for hours worked by

Local 138 members for which the corporate defendants failed to remit the required fringe

benefit contributions.  See Tr. 62:21-72:24 for an overview of the steps involved in

Berdon's payroll compliance audit.

24.     Implementation of the above procedure resulted in a draft report submitted by Berdon to

Local 138's Board of Trustees under cover letter dated July 31, 2006.  (Attach. to Pls.' Ex.

17.)  That draft, identified as "the preliminary findings for the payroll audit," was then

sent by Local 138 to East Port Excavating on October 10, 2006, with a request, in

essence, that they check the information provided to see if it dovetails with their records.

(Id..)  The October 10, 2006 letter indicated that if East Port Excavating did not reply, the

───────────────

        [6]  It was the firm's understanding "that East Port Excavation['s] payroll was being paid
through Eastport Manor."  (Tr. 69:5-7.)

draft audit would be deemed final and, absent payment, would be sent to "the Fund's Attorneys for collection."  Id.

E.    Defendants' Response to Draft Audit

25.    Governale responded to the Berdon draft audit via indignant written comments devoid of sufficient supporting documentation to call into question the findings of the Berdon Audit.  (Pls.' Exs. 18 and 20.)  In addition, Governale called Duffy regarding the draft audit during which Duffy reported that he "couldn't get a word in edgewise," during the torrent of "curse words" uttered by Governale.  (Tr. 54:20-55:12.)  The conclusory and incendiary nature of Governale's written and verbal responses to the draft audit derailed any meaningful opportunity to resolve the payroll contribution dispute via constructive dialogue between the parties as typically occurs.  See Tr. 137:20-25.

F.    Defendants' Complaints About the Berdon Audit

26.    In addition to arguing that Eastport Manor did not have a CBA with the Union, defendants contend that the audit prepared by Berdon is flawed in several respects including (1) its predicate assumptions, "the most egregious of which is that even when a worker was listed on a certified payroll as a laborer or a supervisor and paid the wages of a laborer or supervisor, the auditor recorded those hours as operating engineer hours, simply because the worker was a member of Local 138,"[7]  Defs.' Post-trial Mem. at 3, (2) "the presentation of the audit report is so confusing that East Port's failure to refute the findings with specific names and hours cannot have been assumed to have been

_____

[7]  Defendants report that this purported deficiency "especially affected the hours of Steve Governale, his son Jeff Governale, and his step-son Ed. Swinson."  (Defs.' Post-Trial Mem. at 5.)

-14-

acquiescence," id. at 5, and (3) purported miscalculations attributable to the reciprocity

arrangement between Local 138 and other local operating engineer Unions in the State.

The latter two arguments will be addressed in turn, after the burden of proof issue is

discussed which primarily implicates defendants' initial point.

G.    The Payroll Records Furnished to Berdon Raised Serious Questions About
      the Accuracy of Defendants' Payroll Records vis-a-vis the Hours Worked
      by its Local 138 Members and Contributions Made on Their Behalf to The
      Funds, Thereby Shifting the Burden of Proof as to the Accuracy of the
      Records to Defendants

27.   I found Reinhardt to be a credible witness and the methodology he used in conducting the

      audit to be sound under the circumstances.  That audit uncovered a series of material

      inaccuracies.  Consider, for example, the situation with respect to Ed Swinson.

      Defendants' "certified" payroll records indicate that "he had worked August 9th, the week

      of August 16th, the week of August 23rd, and the week of August 30th" in 2003.  (Tr.

      78:5-11.)  However, no "contributions" to the Funds "were . . . remitted." (Tr. 78:12-15.)

      Not only that, but reference "to the quarterly payroll tax returns of Eastport Manor and

      East Port Excavation" reflects that he did not receive  –  based on the records furnished by

      defendants at least –  a "W-2 for that year" nor was his name to be found "on any of the

      [defendants'] payroll tax returns." (Tr. 78:16-19.)  Given that defendants' certified Payroll

      Reports for those dates list Swinson as having worked "40" hours a week as an operating

      engineer during that time frame, the noted absence of any concomitant contributions to

      the Funds is troubling.  (Pls.' Ex. 25-B.)  Governale did not dispute Reinhardt's testimony

      about Swinson.  Instead, he ascribed the inaccuracies to an "error made by [his]

      accountant . . . . We checked it last night." (Tr. 214:1-8.)

28.   Along the same lines, consider defendants' payroll records for Jonathan Mansmann ("Mansmann").  The Union apparently claimed that he had unpaid benefits.  Governale explained during his testimony that, on "8/4/03," Mansmann "broke his ankle at home" but falsely "claimed it happened at work."  (Tr. 230:10-231:4.)  Thereafter, he "returned to work with a different contractor on 9/1/03."  (Tr. 231:5-16.)  Yet, on the "New York State quarterly form 45 [report] prepared by Eastport Manor" which was "produced to Berdon LLP . . . as part of the audit," Mansmann is listed as having worked for defendants from "October 1st, 2003 through December 31st, 2003."  (Tr. 233:4-17.)  Governale, when first confronted with that inconsistency, told plaintiffs' counsel that counsel was erroneously "looking" at "the third quarter," not the fourth.  (Tr. 233:20.)  Upon being informed that counsel was, in fact, targeting the fourth quarter, Governale undeterred, explained "if you look at the second quarter and third quarter, my accountant didn't put him in.  They forgot to put him in and they made it up later on."   (Tr. 234:2-5.)  Of course, by doing so, the person who made the adjustment falsified the record.

29.   To the extent Governale suggested that the records furnished to Berdon were accurate notwithstanding considerable evidence to the contrary, he was a poor witness for that purpose.  Indeed, when asked if he even bothered to review his "own payroll records and submit [them] to the union" following his receipt of the draft audit, he responded, inter alia, by expressing umbrage that Seth Kneer was "on the thing."  (Tr. 358:18-25.)  When plaintiffs' counsel correctly suggested that his pique was misplaced because the Union was not seeking any contributions attributable to Kneer's employment, Governale responded "Okay, you are probably right," adding "I don't know for certain" and then

-16-

volunteering the he, the witness, "must have looked at the wrong page [of the audit]." (Tr. 360:23-361:20.)

30.     The mere fact that defendants' payroll records are inaccurate is not enough, per se, to alter the burden of proof.  For that to occur, the deficiencies must entail an underreporting of hours worked or otherwise effect the contributions required to be made to the benefit funds.  Here, plaintiffs' draft audit showed an apparent contribution shortfall of $171,735.10.  As noted, defendants elected to provide a cursory response to that determination.  And, while at trial they did provide responses via the belated production of some documentation resulting in a decrease in plaintiffs' demand, as well as by calling several witnesses to the stand, a major portion of the claimed contribution deficiencies remains virtually unchallenged in any meaningful sense.[8]

31.     Without further belaboring the point, there is ample evidence in the record raising serious questions as to accuracy of the payroll and other records furnished by the defendants to Berdon, which questions strongly suggest that defendants' contributions to the benefit are considerably less than required under the terms of the CBA.   Simply put, plaintiffs have made out a prima facie case in that regard, thereby shifting the burden to defendants "to come forward with evidence of the precise amount of work performed or evidence that the assumptions underlying the audit are incorrect."  (Defs.' Post-Trial Mem. at 2-3.)

        Defendants' attack on "the assumptions underlying the audit" will be addressed next.

H.      The Audit is not Predicated on Erroneous Assumptions nor

---

[8]  As explained in the text, _infra_, the Court rejects defendants claims that the audit rests on faulty assumptions and that its format was unfathomable to Governale thereby precluding a fact-specific response by him.

Virtually Impossible to Understand

32.   In preparing the draft audit, Berdon assumed that all of defendants' Local 138 member employees who worked during the audit period did so as operating engineers even if the payroll records of East Port Excavation and Eastport Manor indicated otherwise.  In such instances, defendants maintain, "it would be incumbent on an independent auditor to investigate the matter," Defs.' Post-Trial Mem. at 4, rather than simply ignoring the classifications provided by the employer particularly as to classifications contained in payroll records certified to governmental entities.[9]   That argument has a certain surface appeal, although a prelude to any such investigation would be a meaningful response from defendants and a resulting professional dialogue between the parties.  Defendants' response was far from constructive.  As a result, defendants' argument, viewed in context, does not make sense.

33.   Here, the records furnished by defendants for audit were not reliable.  By way of yet another example of their shortcomings beyond those already detailed in subdivision G supra, consider Governale's situation.

It is undisputed that Governale is the operational head of both defendant corporations.  He is also a member of Local 138 and has been since 1977.  (Tr. 368:1-7.)  As a member, he was required to file an "out of work card" with the Union (Tr. 37:23) when he was not "performing covered work or operating engineer work."  (Tr. 37:8-9.)  Absent such notification being provided, there is a presumption that the member is working "40 hours

---

[9]   Reinhardt testified that he considered "certified payroll reports . . . provided to the government [as] reasonably accurate."  (Tr. 71:19-24.)

a week, 52 weeks a year." (Tr. 38:7-11.)  As part of the audit process, out-of-work cards that "are on file" are "turned over to fund counsel and [the] fund accountants." (Tr. 49:2-3.)  Duffy testified, credibly in my view, that "Mr. Governale never turned one in," (Tr. 48:23-24), thereby permitting the inference that any hours Governale worked were as an operating engineer.

34.   It is important to note that the pivotal question for present purposes as to this subdivision of the opinion is whether Berdon was justified in treating Governale's, and all other union member hours as within title in the first instance subject to defendants producing proof to the contrary in those instances where there was a dispute following issuance of the draft audit.  Given the totality of the circumstances, Berdon acted reasonably in questioning the out of title job designation in Defendants' payroll records.

35.   Defendants' attack on the format of the audit is similarly unavailing.  That format, involving an analysis of both the payroll records of East Port Excavation and of Eastport Manor, came about because of the convoluted interrelationship between those two corporations.  After the incorporation of East Port Excavation in October of 2001, (Tr. 147:3-12), all Eastport Manor employees, including Governale, also became employees of East Port Excavation.  (Tr. 149:12-22.)  Eastport Manor then became "a separate payroll company covering payroll for the working company," East Port Excavation.  (Tr. 146:20-23.)  The above was orchestrated by Governale after he was purportedly "instructed to do so by the IRS representative downstairs in the bankruptcy court. . . ." (Tr. 148:22-149:13.)  In any event, the relationship between the two defendant corporations is "rare," (Tr. 70:15-17), and probably added to the complexity of the draft

-19-

audit report.  But since Governale's actions brought about the complexity, and Governale's claimed difficulty in understanding the audit presumably could have been dispelled by engaging in a civil discourse with the auditor, his present complaint of the unfathomability of the audit is bogus.

36.  Finally, defendants identify another "faulty audit assumption" as relating to:

> East Port's payment of employee benefits to local operating engineer unions other than Local 138.  Just because a person worked as an operating engineer, does not mean that he worked within the jurisdiction of Local 138.  The procedures for the transmittal of benefits from one fund to another as described by Mr. Duffy and set forth in Defendants' Proposed Findings of Fact seem tenuous at best.

(Defs.' Post-Trial Mem. at 4.)

This argument was not sufficiently developed during the trial or explained in defendants' post-trial submission to enable the court to somehow downwardly adjust the amount of the unpaid contributions sought by plaintiffs on the ground advanced.  That is not to say the subject of reciprocity – which is the rubric under which this argument seems to fall – was foreign to the proceedings.  Such was not the case.

As explained by Duffy:

> The operating engineers have a reciprocal system in place.  Any benefits purchased in another jurisdiction, welfare, pension and annuity benefits, are sent to the home Local.  So if a 138 member works in Queens, the benefits purchased on their behalf there, Local 138 would then receive the welfare contributions accrued, the annuity and pension contributions.

(Tr. 39:23-40:5.)

Governale acknowledges that this system was in place although he questions the results of its implementation, specifically as to the Defendants' jobs in New York City.  (Tr. 193:2-23.)

From Duffy's testimony, it appears that, although a preliminary and, incidentally, irrelevant part of the program is often not implemented, "[t]he percentage of time the money comes in [i.e. the contributions for work performed outside Nassau and Suffolk] is 100 percent."  (Tr. 50:1-13.) That testimony stands unrefuted.  Accordingly, I accept that testimony as accurate, and reject defendants' reciprocity–based, conclusory contention to the contrary.

37.    In sum, as to Subdivision H presently under discussion, I find that the audit's format and underlying assumptions are not flawed but rather were reasonable under the circumstances.

38.    Although  Berdon was reasonable given the flawed character of defendants' payroll records in treating all Local 138 members of defendants' workforce as operating engineers, that does not end the discussion.  Defendants called a number of witnesses as part of their case in an effort to show that some of those individuals who were treated as operating engineers actually worked in other capacities, such as, e.g., as laborers or supervisors.  Attention will now be directed to the testimony of those witnesses and the impact their testimony has on the revised figure of $156,619.46 which plaintiffs presently seek by way of delinquent contributions.

I.    Testimony of Jeff Governale ("Jeff"), Scott Warren ("Warren"), Governale, Ed Swinson ("Swinson"), John Mansmann ("Mansmann"), Robert Governale ("Robert"), and Duane Dodd ("Dodd")

39.    <u>Jeff</u>.  Governale is Jeff's father.  (Tr. 305:2-4.)  Although Jeff began working in June 2002, (Tr. 314:8), he did not become a member of the Union until July 28, 2003.  (Tr. 305:15-18.)  Accordingly, he maintains that the "Discrepancy Worksheet" for "June 2003" (Pls.' Ex. 21) which lists his hours as "152," is irrelevant since he was not then a

member of Local 138. (Tr. 307:19-308:4.) His listed hours as an operating engineer for July 2003 are said to be bogus for the same reason. (Tr. 308:5-309:11.) Whether that argument has merit is problematic in that there is evidence in the record that "[b]enefits are to be paid on the machine," so that the operation of the equipment by a non-union employee will not defeat the contribution requirement. (Tr. 51:9-52-12.) Be that as it may, however, Jeff testified convincingly that he did not operate heavy equipment prior to July 28, 2003. (Tr. 322:24-323:16.) Accordingly, any pre-July 28, 2003, operating engineer hours and corresponding dollar amounts attributable to Jeff shall be deleted from the audit. However, hours listed for him thereafter shall stand since they seem correct on their face and defendants have not furnished any credible evidence to the contrary.

40. <u>Warren</u>. Warren became a Local 138 member "[a]round" "1980" (Tr. 272:22-25.) He stopped operating heavy equipment in "2002" due to a disability. (Tr. 275:17-25.) On direct, he testified he received union benefits for his time operating heavy equipment. On cross examination, however, he volunteered that he is "very bad with paperwork" (Tr. 281:7), and suggested if there was "a discrepancy between the amount of hours on Eastport's records and the amount of stamps that came into 138," that the Union's records likely would be correct. (Tr. 280:17-281:16.) And as to defendants' Exhibit C in evidence in which Warren declares that his hours for the period from June 1, 2002, to May 30, 2003, totaled only "320 regular - 49 overtime," he has absolutely "no idea" who prepared the document, who presented it to him for his signature although he believes it does bear his signature. (Tr.281:21-282:8.) He does not have any personal time records, explaining that: "I just go to work, and whatever I get, I get. That is kind of how I

worked."  (Tr. 281:7-9.)

In essence, there is no credible evidence tending to support Warren's conclusory statement that he was paid union benefits for the entire time he served as an operating engineer; he simply does not know one way or the other.

For the reasons provided earlier, the burden of production, if not the burden of proof rests with defendants.  Defendants have failed to demonstrate why Warren's hours and contributions should be modified as requested, notwithstanding some difficulties Reinhardt experienced while testifying about the methodology used by the Berdon's staff accountant in compiling the figures related to Warren's employment.

41.   Governale.  "[T]he audit shows that East Port did not pay benefits for 2,091 operating engineer hours allegedly worked by Steven Governale for the audit period."  (Defs.' Post-Trial Proposed Findings of Fact at 13.)  This figure is overstated, defendants posit, because Governale testified that he recorded his hours as an operating engineer whenever he worked as one.  Id.  But absent some type of documentary or other corroborating evidence, his conclusory statement is unconvincing.

Whatever Governale's strengths may be, attention to detail is not one of them as evidenced, in part, by the subpar state of the payroll records of East Port Excavation and Eastport Manor.  And insofar as he seeks to whittle-down the number of operating hours ascribed to him by Berdon that too is problematic.  He claims that "[t]here [were] times" when he submitted the necessary documentation to Local 138 to substantiate his position that most of his hours on site were devoted to non-operating engineer tasks.  (Tr. 191:24-25.)   The documentation referenced by Governale consists of "Out-of-Work Card[s]";

Section 2-G of the CBA provides that "[s]hould an owner/operator-employer/principal

fail to file an Out-of-Work Card, such owner/operator-employer/principal shall be

presumed to be working [as an operating engineer] and shall be responsible and obligated

to purchase fringe benefit stamps for forty (40) hours each work week."  (Pls.' Ex. 24, Art.

IV, § 2-G.)  Unfortunately, he does not specify the dates associated with those filings

either specifically, or generically by indicating that he filed an out-of-work card each time

he was not working as an operating engineer rather than on occasion.  Moreover, he did

not keep copies of the claimed filings nor any other documentation with respect thereto.

And, as noted previously, Duffy testified credibly that such forms were never furnished to

the Union for Governale personally.

For the reasons indicated, the defendants' request that the sum of $156,619.46 be

further reduced by deducting the sums attributable to Governale is denied.

42. <u>Swinson</u>.  Dependants' objections to hours listed in the audit as to Swinson is twofold: (1)

it ignores the classifications included in certified payroll records, and (2) it fails to

recognize that "Swinson did not become a member of Local 138 until July 29, 2003 and

accordingly, Local 138 would not be owed benefits for any work performed before that

date."  (Defs.' Post-Trial Findings of Fact at 17.)

As discussed earlier, defendants' payroll records are riddled with inaccuracies thus

warranting the nonacceptance of their classifications subject to obtaining further proof

from the defendants.  Such further proof was scant.  Swinson did not testify.  Tellingly,

Jeff reported that when he had occasion to observe with his stepbrother Swinson at a job

site between 2000 and 2005, Swinson functioned as an operator, not as a laborer.  (Tr.

-24-

310:15-311:9 and 319:9-17.)  And, again, given that "benefits are paid on the machine,"
the July 29, 2003 line of demarcation proffered by defendants is not convincing.

The downward adjustment sought by defendants based on the nature of Swinson's
activities is denied.

43.  <u>Mansmann</u>.  Mansmann was a Local 138 member hired by East Port Excavation to
operate heavy equipment at Stony Brook University.  He injured his left foot August 4,
2003, thereby ending his employment with defendants.  (Tr. 230:18-231:5; <u>see also</u> Defs.'
Ex. G.)  He "returned to work with a different employer on 9/1/03."  (Defs.' Ex. G.)  He
was carried on defendant's payroll for the weeks ending "8/2/03" and "8/10/03."  (Pls.' Ex.
25A.)  His total time on the job during those periods in August was eighty hours regular
time, plus five hours overtime.  <u>Id.</u>  Yet, the audit report incorrectly charges him with
two hundred regular and twenty four overtime hours for August 2003.  (Pls.' Ex. 21, p.
18.)  Accordingly, defendants are entitled to a reduction in the amount owed of
$3,912.00.

44.  <u>Robert Governale</u> ("Robert").   Robert, the younger brother of Steven Governale, (Tr.
328:3-25) testified credibly at trial on defendants' behalf.  As explained by defendants:

> [Robert] . . . performed tree removal work on an East Port project
> as an employee of Ely Tree.  (Tr. 329:19-330:25.)  Since Robert
> Governale was not a member of Local 138 (Tr. 331:4-9), it was
> necessary for East Port to pay an operating engineer for the
> machine time.  (Tr. 331:10-332:18.) Robert Governale's testimony
> matched that of his brother Steven Governale.  (Tr. 150:2-152:9.)
> Steven Governale testified that he paid an operating engineer
> named Michael Levatino to watch his brother operate the tree
> removal equipment.  (Tr. 150:17-151:9.)  The certified payrolls for
> July 19, 2003 and July 26, 2003, which show both men listed as
> operating engineers, corroborate the testimony of both men.  (Pls.

-25-

Ex. 25-B.)

(Defs.' Post-Trial Proposed Findings of Fact at 19.)

Defendants argue that

> [s]ince benefits are paid "to the machine" not the person . . . only one operator has to be paid to run one machine.  Accordingly, if East Port paid Michael Levatino to run the tree removal machine, then it does not have to pay for Robert Governale and vice versa. Here, according to the audit report, Michael Levatino was paid benefits for 112 hours, including for all the time worked by Robert Governale, so Robert Governale hours should be deducted from the audit: 72 regular hours * 27.34 (2003 reg. rate) = $1,968.48.

Id. at 20.

Plaintiffs have not specifically responded to defendants' argument.  In that I found the testimony of both Robert and Steven to be credible on this point, I accept defendants' concomitant position and direct that the requested adjustment of $1,968.48 be made.

45.   Duane Dodd.  ("Dodd").   Dodd a member of Local 138 (Tr. 293:14-15), worked for defendants for approximately two and a half months, (Tr. 299:20-21), beginning in June 2004.  (Tr. 293:20-24.)  Parenthetically, during that time, he observed "Steven Governale" operating equipment as an operating engineer.[10]   In any event, he testified, and I accept that, although he had to enlist the aid of a union "delegate," he has received all his "[benefit] checks."  (Tr. 299:16-300:4.)  Therefore, the monies claimed by plaintiffs to be due shall be reduced by $3,912.00.

---

[10]  Compare Dodd's testimony with paragraph 2 of Governale's affidavit in which Governale affirms: "I have been employed as an owner/Laborer/bricklayer/laborer/operator by East Port Excavation & Utilities from June 1, 2003 through May 31, 2004.  I affirm that I did not perform bargaining unit operating engineer work covered by the Collective Bargaining Agreement of the International Union of Operating Engineers Local Union 138, 138A, 138B and 138C (hereinafter, the Union)."   (Defs.' Ex. L-1-59.)

J.     Facts Pertaining to Relationship Between the Defendant Corporations and
       Plaintiffs' Effort to Hold Governale Personally Responsible for the
       Corporations' Delinquent Contributions

46.    Each corporation is a party to a CBA with Local 138 as explained previously.  And the

       two corporations, since Steven Governale incorporated East Port Excavation in 2001 (Tr.

       146:4-5), are essentially two integrated divisions of a single operation housed in the same

       quarters, utilizing the same employees and both under the control of Governale.  Eastport

       Manor became "a separate payroll company covering payroll for the working company,"

       viz. East Port Excavation.  (Tr. 146:13-23.)  Before East Port Excavation was created,

       Eastport Manor performed both functions.  The restructuring occurred because "the IRS

       had liened all of [Eastport Manors'] jobs." (Tr. 146:6-12.)  So it was decided – following

       a discussion with an "IRS representative" (Tr. 146:13-15) – to have the jobs done by the

       then newly created East Port Excavation.[11]

CONCLUSIONS OF LAW

47.    The plaintiffs' established a prima facie case as to the Berdon audit, thereby shifting the

       burden "to the employer to come forward with evidence of the precise amount of work

       performed, or evidence that the assumptions underlying the audit are incorrect." Local

       282 Welfare Trust Fund, 1993 WL 120081, at *1 (internal citation omitted).  Proceeding

       in reverse order, defendants have not shown that "the assumptions underlying the audit"

       are flawed as explained previously.  With respect to the number and nature of the hours

       worked, plaintiffs have made out a prima facie case as to the inadequacy of defendants'

---

[11]  Eastport Manor was able to meet payroll compliments of monies furnished by East
Port Excavation.  (Tr. 147:19-148:4.)

payroll records.  However, defendants have not responded "with evidence of the precise amount of work performed."  Having failed to discharge that burden, the delinquencies listed in the Berdon audit – subject to the modifications (a) reached by the parties during the trial and (b) as found by the Court, <u>supra</u> – are accepted as accurate.

48.     East Port Excavation and Eastport Manor are each a signatory to a collective bargaining agreement with plaintiffs.  As a result, each corporate defendant is responsible to pay delinquent benefit contributions consistent with its respective collective bargaining agreement.

49.     Moreover, not only are each of the corporate defendants liable to plaintiffs under the collective bargaining agreement it signed, but it is also liable, jointly and severally, with its counterpart defendant corporation for that corporation's CBA obligations.  That is because the two corporations "are essentially two integrated divisions of the single operation housed in the same quarters utilizing the same employees and both under the control of Governale."  <u>See</u> para. 46 <u>supra</u>.  Eastport Manor, as also noted earlier, is simply a payroll company for East Port Excavation with East Port Excavation generating the funds, and transferring those funds to Eastport Manor so that the latter entity may make payroll.  <u>Id.</u>  Given that the "nominally separate entities are actually part of a single integrate enterprise," they constitute a "single employer" and, as such, each corporation is jointly and severally liable for the delinquent contributions, not only of itself but also of its sister enterprise.  <u>See</u>  <u>Bourgal v. Robco Contracting Enterprises, Ltd</u>, 969 F. Supp.

854, 862-863 (E.D.N.Y. 1997).[12]

50. Plaintiffs maintain[13] and defendants have not contested that delinquent contributions are Fund assets.

51. Governale, based on his operational control over each of the corporate defendants is a fiduciary for ERISA purposes. By failing to remit the required contributions, he has interfered with fund assets. As a result, he is responsible jointly and severally with each of the defendant corporations for the monies owed to plaintiffs. See 29 U.S.C. Section 1109(a); NYSA-ILA Medical and Clinical Fund v. Katucci, 60 F. Supp. 2d 194, 200-03 (S.D.N.Y. 1999); LoPresti v. Terwilliger, 126 F.3d 34, 39-40 (2d Cir. 1997).

## CONCLUSION

Plaintiffs have established, with the benefit of the burden shifting mechanism discussed supra, that the defendants, and each of them, are liable, jointly and severally for contributions not made to plaintiffs for the period from June 1, 2000 to December 31, 2009. Plaintiffs are directed to submit a purposed judgment, on notice, in accordance with this opinion indicating the amount of delinquent contributions, together with interest on those delinquencies as provided by law, along with any claim for liquidated damages. As to the latter two items, plaintiffs will set forth the statutory and/or decisional bases for the items sought and the precise methods used for the

---

[12] Plaintiffs have invoked both the alter ego doctrine as well as the single employer doctrine in their effort to have both defendant corporations jointly and severally responsible for the delinquent benefit contributions attributable to each. In that plaintiffs have successfully relied on the single employer doctrine, it is not necessary for the Court to address their alternate theory seeking the same result. Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991)(holding that "single employer/single unit doctrine" has "the same binding effect on a non-signatory" as the "alter ego doctrine").

[13] See Pls.' Proposed Findings of Fact and Conclusions of Law, p. 10, ¶ 49.

concomitant computation.

With respect to Counsel fees, plaintiffs shall submit an affidavit on or before November 8, 2013 specifying by tasks and date the time spent prosecuting this action along with information supporting the hourly rate sought for those efforts.  Should defendants oppose plaintiffs' fee application, their papers in opposition shall be filed by December 6, 2013.  Reply papers, if any, shall be due by December 13, 2013.

The above constitutes the Court's Findings of Fact and Conclusions of Law.

SO ORDERED.

DATED: September 19, 2013
         Central Islip, New York


                        _____/s/_____
                        DENIS R. HURLEY, U.S.D.J.

-30-